IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

———————————————

THE STATE OF ARIZONA,
*Appellee*,

*v.*

ARTHUR CORNELL WRIGHT,
*Appellant*.

No. 2 CA-CR 2015-0222
Filed March 23, 2016

———————————————

Appeal from the Superior Court in Pima County
No. CR20132689002
The Honorable Richard D. Nichols, Judge

**AFFIRMED**

———————————————

COUNSEL

Mark Brnovich, Arizona Attorney General
Joseph T. Maziarz, Section Chief Counsel, Phoenix
By David A. Sullivan, Assistant Attorney General, Tucson
*Counsel for Appellee*

Harriette P. Levitt, Tucson
*Counsel for Appellant*

**OPINION**

Judge Miller authored the opinion of the Court, in which Presiding Judge Vásquez and Chief Judge Eckerstrom concurred.

M I L L E R, Judge:

**¶1**　　　After a jury trial, appellant Arthur Wright was convicted of two counts of possession of a narcotic drug for sale and one count of possession of drug paraphernalia, and sentenced to concurrent prison terms of 10.5 years for the first two charges and 2.25 years for the paraphernalia offense. Wright argues the trial court erred by admitting into evidence a redacted audio recording made by police officers during the undercover operation leading to his arrest. Finding no abuse of discretion, we affirm.

## Factual and Procedural Background

**¶2**　　　We view the facts in the light most favorable to sustaining the jury's verdicts. *State v. Nelson*, 214 Ariz. 196, ¶ 2, 150 P.3d 769, 769 (App. 2007). In June 2013, Tucson Police Officer J.D. was working undercover as part of a drug interdiction team that focused on street sales of narcotics. He approached a man near a convenience store who was later identified as Wright's co-defendant, Richard Davis. J.D. asked if Davis could help him buy methamphetamine and Davis said he could. Davis climbed into J.D.'s unmarked truck. The truck had a one-way radio transmitter and digital audio recorder hidden inside it. Other police officers were listening to everything that was happening in the truck through the one-way radio and were prepared to move in if they believed J.D. was in danger.

**¶3**　　　J.D. gave Davis two $20 bills—one as his payment and the other to use to buy the methamphetamine. He testified they also talked about "possibly partying that night," and stated he had offered Davis a hotel room for the evening. Davis made a telephone call using J.D.'s cell phone and then directed J.D. to an apartment,

but when they arrived Davis was unable to obtain methamphetamine.

¶4        Davis then directed J.D. to drive to a particular gas station.  Davis got out of the truck and went into the gas station's convenience store.  Shortly thereafter, a car pulled into the parking space immediately adjacent to J.D.'s truck.  A man later identified as Wright was in the passenger seat of that car.  The driver of the car called J.D. on his cell phone.  J.D. explained to the driver of the car that Davis was inside the store and would be out shortly.  Davis came out of the store and got into the driver's-side rear seat of the car.  J.D. saw Wright reach down under his seat, and then "do[] something back and forth" with Davis.

¶5        Davis got back in J.D.'s truck, showed him a baggie that contained what appeared to be methamphetamine, and said, "See, I got it."  When J.D. realized Davis planned to hold onto the baggie until J.D. had booked the hotel room they had talked about, he made a prearranged arrest signal so other officers would stop the car.  They did so and arrested Davis.[1]

¶6        Another Tucson Police officer stopped the car in which Wright was riding as a passenger.  As the officer approached the car, he saw Wright trying to conceal something between the center console and the seat.  It turned out to be a digital scale.  As the officer removed Wright from the car, the officer saw six small baggies on the passenger seat where Wright had been sitting.  Two of the baggies contained crack cocaine; the other four contained heroin.

¶7        At trial, a redacted version of the audio recording from J.D.'s truck was admitted into evidence over Wright's objection as Exhibit 49.  Wright was convicted and sentenced as described above and now appeals.  We have jurisdiction under A.R.S. §§ 13-4031 and 13-4033(A)(1).

---

[1] Davis pled guilty to solicitation to offer to transfer a dangerous drug (methamphetamine) and testified at Wright's trial.

## Analysis

¶8        Wright argues the trial court prejudicially erred by admitting Exhibit 49 over his objection.  We review the trial court's evidentiary rulings for an abuse of discretion.  *State v. Johnson*, 212 Ariz. 425, ¶ 25, 133 P.3d 735, 743 (2006).

¶9        The portion of Exhibit 49 to which Wright objected covered the moment Davis got out of J.D.'s truck and went into the convenience store, until the moment he got back into the truck.  It consists of the following statements:

> Two-Five,[2] he's getting out and he's, uh, looks like going in the store.  He's got the twenty in his right hand.  And again, he's got whatever it is.  He hasn't moved it.  It's still in his left shoe.[3]  Inside the store I think he's buying a beer or something.  Got a, no, that's probably just some U of A people.  Next to us.  Just in case you guys can't see, I'm parked, uh, just in front of the store, facing south, kind of over towards the car wash and in front.  He's still at the counter right now.   And there's a car pulling up.  Looks like it's a Ford or something.   This might be our delivery right here.  It's a Ford Taurus, it looks like, uh, gray.   There's a number three and a

---

2J.D.'s radio call sign that night was "Bravo 25."

3J.D. had seen Davis return from the apartment with a baggie, which he had placed in his shoe or sock.  Davis admitted at Wright's trial that he had purchased a small baggie of crack cocaine for himself at the apartment.  A possession of crack cocaine charge against Davis was dropped as part of his plea agreement.

number five in the car.[4] A number three male passenger, and a number five female driver. [phone rings] She's calling me right now. It's the car next to us. Hello? Hey, uh, he's, uh, he's in the store right now, uh, just getting a drink. He should be coming out here in a sec. Oh, is that you? Hey, hey, I'll wait 'til he comes out and you guys can talk to him or whatever. Cool. Later. Bye. Yeah, she was on the phone. Looks like he's coming out now. Looks like he just bought a beer or something. And he's walking over to her. He's getting in the left rear. Looks like the number three male front right, he's got a gray cap and like a black cut-off jersey kind of thing on. He's reaching up kind of under the seat. Looks like he's messing with something. Maybe he's got product with him. The driver's on the phone again. Our guy's getting out, it looks like. He's gonna get back in with me.

¶10 Wright argues Exhibit 49 essentially was a police report and inadmissible under the general rule precluding the admission of hearsay. *See* Ariz. R. Evid. 801(c) (defining hearsay); *State v. Smith*, 215 Ariz. 221, ¶ 28, 159 P.3d 531, 539 (2007) (police report inadmissible unless hearsay exception applies). Hearsay generally is inadmissible if no exception applies. Ariz. R. Evid. 802. The state argues here, as it did below, that the recording was admissible as a present sense impression—"[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it," Ariz. R. Evid. 803(1).

---

[4]J.D. testified his team used numbers as shorthand for racial identification. "[N]umber three" means African-American and "number five" means Caucasian or white.

¶11        The present-sense-impression exception to the hearsay rule "is based on the notion that 'substantial contemporaneity of event and statement' negates the likelihood of fabrication or misrepresentation." *State v. Damper*, 223 Ariz. 572, ¶ 16, 225 P.3d 1148, 1152 (App. 2010), *quoting State v. Tucker*, 205 Ariz. 157, ¶ 42, 68 P.3d 110, 118 (2003). "We assume, as a general matter, that when the declarant has had little time to reflect on the event she has perceived, her statement will be spontaneous and therefore reliable." *Tucker*, 205 Ariz. 157, ¶ 42, 68 P.3d at 119. Accordingly, to qualify as an admissible present sense impression, a statement "require[s] . . . immediacy." *State v. Thompson*, 146 Ariz. 552, 557, 707 P.2d 956, 961 (App. 1985). For example, a witness's statement, "There goes your Fast and Furious movie," comparing her observation about two cars racing past her to scenes in a movie about street racing, was admissible as a present sense impression. *State v. Sucharew*, 205 Ariz. 16, ¶¶ 24-26, 66 P.3d 59, 67 (App. 2003). In the same vein, a recording of a 9-1-1 call in which the caller described the appearance of two burglars and their actions as she watched them load her neighbor's property into their truck, was a proper present sense impression. *State v. Rendon*, 148 Ariz. 524, 526, 528, 715 P.2d 777, 779, 781 (App. 1986).

¶12        Wright admits that "[a]t first glance," Exhibit 49 "seems to fall within" the present-sense-impression exception. *See* Ariz. R. Evid. 803(1). We agree that Exhibit 49 falls within the plain language of Rule 803(1). The exhibit consists of descriptions of events (such as the suspects' activities and movements) and conditions (such as descriptions of people and vehicles and their relative locations) made as the declarant was observing those events and conditions or immediately thereafter. *Id.*; *accord Sucharew*, 205 Ariz. 16, ¶¶ 24-26, 66 P.3d at 67; *Rendon*, 148 Ariz. at 528, 715 P.2d at 781. Wright nevertheless contends the hearsay exception must be disregarded here because J.D. "was making the recording for the specific purpose of creating evidence to be used at trial," and had a motive and an opportunity to reflect or fabricate. As a result, he argues, the statements in Exhibit 49 lack the assurances of reliability that justify admission of the typical present sense impressions of disinterested bystanders like the declarants in *Sucharew* and *Rendon*.

In his reply brief, Wright suggests *Fischer v. State*, 252 S.W.3d 375 (Tex. Crim. App. 2008) is "a case much more on point."

**¶13**        In *Fischer*, a state trooper turned on his dashboard-mounted video camera and body microphone, and then announced his intention to pull a vehicle over because the driver was not wearing a seatbelt. *Id.* at 376-77. After stopping Fischer's truck, the officer asked him whether he had any alcohol in the truck, adding, "I smell alcohol." *Id.* at 377. The officer proceeded with an investigation for driving while under the influence of alcohol. *See id.* At four different points during the course of the investigation, he returned to his patrol car to record his findings on camera. *Id.* at 377, 385. He dictated to the camera that the "'subject [had given] several clues'" during a heel-to-toe test, such as starting the test too soon, losing his balance, "'stepp[ing] off the line two times,'" making an "'improper turn,'" and using his hands to balance. *Id.* at 377. He added that Fischer had "'indicated the same clues'" during a one-leg stand test, even though the officer noted he had given the defendant "'a second chance to do it.'" *Id.* He dictated the following observations after conducting a horizontal gaze nystagmus test: "'Subject has equal pupil size, equal tracking, has a lack of smooth pursuit in both eyes, and has distinct nystagmus at maximum deviation in both eyes. Subject also has onset of nystagmus prior to forty-five degrees in both eyes.'" *Id.* He also noted for the recording that Fischer's eyes were glassy and bloodshot, his speech was slurred, his breath smelled strongly of alcohol, and he had a wine opener in his vehicle. *Id.* Ultimately, the officer dictated to the camera, "'Subject is going to be placed under arrest for DWI,'" and then he arrested Fischer, telling him "'I believe you are drunk.'" *Id.*

**¶14**        Fischer filed a motion to suppress the videotape of the traffic stop, but the trial court denied the motion, reasoning the tape constituted a present sense impression. *Id.* at 377-78; *see also* Tex. R. Evid. 803(1) (textually identical to Ariz. R. Evid. 803(1)). The Texas Court of Criminal Appeals affirmed the court of appeals, reversing the trial court. *Fischer*, 252 S.W.3d at 387. The court reasoned that "reflective narratives, calculated statements, deliberate opinions, conclusions, or conscious 'thinking-it-through' statements" are not proper present sense impressions, because "'[t]hinking about it'

destroys the unreflective nature required of a present sense impression." *Id.* at 381; *accord Thompson*, 146 Ariz. at 557, 707 P.2d at 961 (present sense impression requires immediacy). The court concluded the officer's statements to the camera amounted to "a speaking offense report." *Fischer*, 252 S.W.3d at 385.

¶15 *Fischer* is distinguishable from the present case. Unlike the officer's "reflective narratives" memorialized for the camera in *Fischer*, 252 S.W.3d at 381, J.D.'s real-time descriptions of the suspects' appearance, vehicle, and movements were not primarily designed to chronicle earlier investigative findings. Rather, the statements described the events of a crime as it unfolded, and provided law enforcement officers with information they could use to disrupt that crime and successfully apprehend the perpetrators. In that respect, Exhibit 49 closely parallels the recording of the 9-1-1 call the court found admissible as a present sense impression in *Rendon*, in which the caller provided descriptions of burglary suspects, their vehicle, and their activities in real time as she watched the crime unfold. 148 Ariz. at 526, 528, 715 P.2d at 779, 781. As in *Rendon*, the statements were virtually contemporaneous with the ongoing crime they described. *Id.*

¶16 The fact that the declarant in the present case was a law enforcement officer, unlike the caller in *Rendon*, does not change the analysis. *See* Ariz. R. Evid. 803(1); *Tucker*, 205 Ariz. 157, ¶ 42, 68 P.3d at 119 (contemporaneity of statement and event ensures reliability of present sense impression). The problem with the statements the trial court erroneously admitted in *Fischer* was not that they were made by a law enforcement officer, but that they were made *reflectively*, "with an eye toward future litigation." *See* 252 S.W.3d at 383-85. In contrast, the totality of the circumstances reveals that J.D.'s primary reason for making the statements was to ensure his own safety during a potentially dangerous undercover operation. *See Tucker*, 205 Ariz. 157, ¶ 45, 68 P.3d at 119 (admissibility of statement as present sense impression determined in view of totality of circumstances). J.D. testified other officers were listening to him over the one-way radio "[d]uring this entire time . . . so that if I . . . give signals that I'm in danger, they can move in." "I'm constantly watching for people, you know, pulling knives on me, pulling guns

on me," he continued. By providing details about the situation as it unfolded, such as the positions of relevant vehicles, physical descriptions of suspects and their car, and a description of Wright reaching under the seat where a weapon could have been stored,[5] J.D. sought to ensure the other officers listening to him would be prepared to intervene quickly and effectively if the situation deteriorated. *Accord United States v. Campbell*, 782 F. Supp. 1258, 1261-62 (N.D. Ill. 1991) (recording of officer's statements over radio to dispatcher describing suspect's movements and actions as officer chased him on foot admissible as present sense impression under Fed. R. Evid. 803(1)); *Flythe v. District of Columbia*, 4 F. Supp. 3d 222, 233-34 (D.D.C. 2014) (officer's statements over radio to dispatcher (1) identifying his location, (2) immediately thereafter saying "'[d]rop the knife,'" and (3) immediately thereafter saying defendant "'[t]ried to stab me, ma'am. My gun jammed. Get official on this location,'" admissible as present sense impressions under Fed. R. Evid. 803(1)); *see also* Fed. R. Evid. 803(1) (textually identical to Ariz. R. Evid. 803(1)). With his own safety at risk, J.D. had a strong incentive to report his real-time observations accurately.

¶17　　　　In sum, the trial court did not abuse its discretion in determining Exhibit 49 was admissible as a present sense impression. Ariz. R. Evid. 803(1); *see, e.g., Rendon*, 148 Ariz. at 526, 528, 715 P.2d at 779, 781; *Campbell*, 782 F. Supp. at 1261-62. Accordingly, we need not address the state's alternative argument that it was also admissible under the residual hearsay exception of Rule 807(a), Ariz. R. Evid.

## Disposition

¶18　　　　For the foregoing reasons, we affirm Wright's convictions and sentences.

---

[5]Indeed, police officers subsequently found a handgun in the glove compartment.